**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

MICHAEL PERKINS and
LORI PERKINS, his wife,

Plaintiffs,

v.

Case No.:
Division:

LARGO MEDICAL CENTER, INC., d/b/a HCA FLORIDA LARGO HOSPITAL; HCA, INC. d/b/a HCA HEALTHCARE; and SEBASTIAN STROM, M.D.,

Defendants.
_______________________________________________/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs MICHAEL PERKINS and LORI PERKINS, his wife, sue defendants LARGO MEDICAL CENTER, INC., d/b/a HCA FLORIDA LARGO HOSPITAL; HCA, INC. d/b/a HCA HEALTHCARE; and SEBASTIAN STROM, M.D. and allege:

**JURISDICTION AND PRELIMINARY ALLEGATIONS**

1. Plaintiffs MICHAEL PERKINS ("MR. PERKINS") and LORI PERKINS ("MRS. PERKINS") are citizens of the state of Ohio, over the age of eighteen, and otherwise *sui juris*.

2. Defendant LARGO MEDICAL CENTER, INC.,d/b/a HCA FLORIDA LARGO HOSPITAL ("HCA LARGO") is a corporation, organized and existing under the laws of the state of Florida. HCA LARGO is a citizen of the states of Florida and Tennessee, having its primary address and headquarters at One Park Plaza, Nashville, Tennessee, and operating a hospital, licensed under Chapter 395, Florida Statutes, at 201 14th St SW, Largo, Pinellas County, Florida.

3. Defendant HCA, INC. d/b/a HCA HEALTHCARE FLORIDA LARGO HOSPITAL ("HCA LARGO") is a Delaware corporation, having its primary address and headquarters at One Park Plaza, Nashville, Tennessee. HCA HEALTHCARE operates hospitals and healthcare facilities across 20 U.S. states , to wit: Alaska, Arkansas, California, Colorado, Florida, Georgia, Idaho, Indiana, Kansas, Kentucky, Louisiana, Missouri, Nevada, New Hampshire, North Carolina, South Carolina, Tennessee, Texas, Utah, and Virginia. At all relevant times HCA HEALTHCARE was the ultimate parent entity exercising direct and indirect operational control over HCA LARGO and all affiliated HCA entities named herein.

4. HCA HEALTHCARE is not a citizen of Ohio.

5. Defendant SEBASTIAN STROM, M.D. ("STROM") is a citizen of the state of Florida, residing in Hillsborough County, Florida. At all material times, STROM was and remains the Chief Executive Officer of HCA LARGO.

6. WESTON LYNN CONNELLY, D.O. ("CONNELLY") is an osteopathic physician, licensed under Chapter 459, Florida Statutes, practicing internal medicine in Pinellas County, Florida. CONNELLY was a member of the active medical staff, credentialed and privileged at HCA LARGO, during the events described in this complaint.

7. MARLETA CHRISTINE SULLIVAN, D.O. ("SULLIVAN") was And remains an osteopathic physician. During the events described in this complaint, SULLIVAN was a 3rd year internal medicine resident, in training at HCA LARGO.

8. ANDREAS KYPRIANOU, M.D. ("KYPRIANOU") was at all relevant times a physician, licensed under Chapter 458, Florida Statutes. KYPRIANOU was a member of the active medical staff, credentialed and privileged as a critical care physician at HCA LARGO.

9. The amount in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.00. The plaintiffs are citizens of the state of Ohio and no defendant is a citizen of the state of Ohio. This court has jurisdiction pursuant to 28 U.S.C. §1332.

10. This cause of action arose in the Middle District of Florida and venue is proper under 28 U.S.C. §1391(b).

11. All conditions precedent to the institution of this action have been satisfied or have occurred.

**FACTS COMMON TO ALL COUNTS**

12. On or about 3 April 2024, while on vacation in Pinellas County, Florida, MR. PERKINS became confused and disoriented. He was transported by ambulance from his hotel to the emergency department (ED) at HCA LARGO'S hospital.

13. On arrival, MR. PERKINS was hemodynamically stable with a Glasgow Coma Scale[1] score of 14. In the emergency department, MR.

[1]Developed at the University of Glasgow in 1974, the Glasgow Coma Scale (GCS) is the most commonly used scale for measuring decreases in consciousness. The GCS "scores" how awake a patient is, the patient's level of awareness, and the patient's response to basic instructions. https://www.glasgowcomascale.org/

PERKINS was evaluated by Dr. Benjamin Minor (resident) and Dr. Oscar Espetia (attending).

14. The history obtained at the hospital included reports from the patient's family that MR. PERKINS had appeared confused and experienced visual hallucinations the previous day. The history further revealed that MR. PERKINS and his family had spent most of the previous four days at the beach and that two days earlier, MR. PERKINS had an episode of nausea and vomiting after eating oysters.

15. At the time of his presentation to HCA LARGO, MR. PERKINS had hypertension, treated with losartan, amlodipine, and chlorthalidone, the latter of which had been recently initiated. MR. PERKINS's initial vital signs included a blood pressure of 140/104 mmHg and a pulse of 74 beats per minute. He was alert and oriented to person, place, and time, though mild tremors were noted on examination.

16. Laboratory studies revealed severe hyponatremia (serum sodium 103 mEq/L) and mild hypokalemia (serum potassium 3.2 mEq/L). Additional findings included elevated liver enzymes (AST 90 U/L), elevated ammonia (35 U/L), low magnesium (1.6 mg/dL), low

phosphorus (2.3 mg/dL), and elevated creatine phosphokinase (1,828 IU/L). MR. PERKINS's blood alcohol level was undetectable. A head computed tomography (CT) scan did not reveal any brain swelling and was otherwise unremarkable.

17. Hyponatremia refers to a low level of sodium in the blood. Hyponatremia may result from excess fluid in the body relative to a normal amount of sodium, or it may be due to a loss of sodium and body fluid caused by chronic conditions. Symptoms of low blood sodium are nonspecific, and can include mental changes, headache, nausea and vomiting.

18. Hyponatremia is the most common electrolyte disorder encountered in clinical medicine. The prevalence of hyponatremia in the United States ranges from 3 million to 6 million individuals per year. Approximately 3-6% of adult patients in the ED have some degree of hyponatremia, and the reported incidence of hospital-associated hyponatremia ranges between 10% and 30%, depending on the patient population, with severe hyponatremia accounting for 1% of patients. It is well known that hyponatremic patients have an increased risk of death

compared to patients with normal serum sodium levels; overall mortality of hyponatremia ranges from 3% to 29%.

19. MR. PERKINS received one liter of normal saline intravenously and was also administered chlordiazepoxide for suspected alcohol withdrawal.

20. Given the severity of the patient's hyponatremia, Doctors Espetia and Minor consulted first year resident Leon Peter, D.O. and attending physician KYPRIANOU from Critical Care Medicine. In their assessment and plan dated 3 April 2024 at 10:05 p.m., they noted "acute metabolic encephalopathy secondary to severe hyponatremia, with concern for alcohol withdrawal" and recommended admission to the intensive care unit. Their plan included monitoring serum sodium with a basic metabolic panel every 4 hours, gradual correction of hyponatremia, administration of normal saline at 50 mL/hour, treatment of alcohol withdrawal with chlordiazepoxide, and electrolyte repletion. This plan was later amended on 4 April 2024 at 5:46 a.m. by Dr. Adolph Marmetschke, who increased the normal saline rate to 150 mL/hour and held chlorthalidone.

21. Nephrology was consulted for management of severe hyponatremia, with Dr. Jonathon Charpin (resident) and Dr. Kedar Shetye (attending) evaluating the patient. In their initial assessment and plan dated April 4, 2024, at 6:16 a.m., they documented: "acute metabolic encephalopathy secondary to hyponatremia with a possible component of alcohol withdrawal; severe hyponatremia, likely multifactorial due to adverse medication effect from chlorthalidone, poor oral intake, and beer potomania; hypokalemia." They recommended continuing normal saline at 50 mL/hour, trending serum sodium every four hours, and monitoring and repleting electrolytes as needed.

22. In a progress note dated 5 April 2024, at 7:13 a.m., Dr. Charpin noted a serum sodium level of 113 mEq/L and recommended continuing normal saline at 150 mL/hour, initiating tolvaptan 15 mg daily, continuing to monitor serum sodium every four hours, and replacing electrolytes as needed.

23. Dr. Shetye added to the note later that day at 7:04 p.m., documenting a serum sodium of 126 mEq/L. At that time, he assessed that the sodium was correcting too rapidly and recommended initiating

dextrose 5% in water (D5W) at 75 mL/hour.

24. On 6 April 2024, at 2:32 p.m., a new nephrologist, Dr. Tushar Sharma, evaluated the patient and noted a serum sodium of 133 mEq/L. He assessed that hyponatremia was likely due to thiazide diuretic use and that the sodium had increased by 24 mEq/L over 48 hours, representing overly rapid correction. He recommended administration of desmopressin 2 mcg intravenously and continuation of D5W, with a target serum sodium of less than 130 mEq/L. However, the patient was not informed of the desmopressin recommendation. Instead, CONNELLY and SULLIVAN presented MR. PERKINS with the choice to be discharged to continue care at his home in Ohio. CONNELLY and SULLIVAN discharged MR. PERKINS on 6 April 2024 without administering further desmopressin.

25. During his hospitalization, MR. PERKINS's serum sodium increased rapidly. The documented laboratory values are summarized below:

| Date | 4/3/24 | 4/3/24 | 4/3/24 | 4/4/24 | 4/4/24 | 4/4/24 | 4/4/24 | 4/4/24 | 4/4/24 |
|---|---|---|---|---|---|---|---|---|---|
| Time | 7:51 pm | 9:27 pm | 11:46 pm | 4:33 am | 6:51 am | 10:42 am | 3:00 pm | 7:51 pm | 11:48 pm |
| Sodium | 103 | 106 | 107 | 110 | 109 | 106 | 106 | 107 | 109 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| (mEq/L) | | | | | | | | | |
| Date | 4/5/24 | 4/5/24 | 4/5/24 | 4/5/24 | 4/5/24 | 4/5/24 | 4/6/24 | 4/6/24 | 4/6/24 |
| Time | 5:08 am | 7:28 am | 11:35 am | 2:23 pm | 6:44 pm | 10:45 pm | 4:31 am | 7:02 am | 12:03 pm |
| Sodium (mEq/L) | 113 | 114 | 119 | 121 | 126 | 129 | 129 | 132 | 133 |

26. Overall, the serum sodium increased by 4 mEq/L during the first 24-hour period, and by 19 to 22 mEq/L during the subsequent 24-hour period.

27. After discharge, MR. PERKINS was seen by his primary care physician, Dr. Andrew Stroud, on April 9, 2024. Mrs. Perkins reported that, since discharge 2–3 days earlier, her husband had experienced confusion, headaches, and gait instability. She noted some improvement over the preceding days, but symptoms persisted. In the office, MR. PERKINS was able to answer questions appropriately. Dr. Stroud referred him to a neurologist and planned a two-week follow-up.

28. On April 19, 2024, MR. PERKINS underwent an outpatient brain magnetic resonance imaging (MRI), which demonstrated central pontine myelinolysis and extrapontine myelinolysis, consistent with osmotic demyelination syndrome (ODS). Based on these findings, he presented the same day to the emergency department at Mercy Health Jewish Hospital with imaging results and complaints of upper extremity

tremors. His serum sodium was 137 mEq/L. As he was clinically stable, he was discharged with instructions to follow up with his primary care physician.

29. Later that afternoon on 19 April 2024, MR. PERKINS saw his primary care physician, reporting worsening symptoms and difficulty with word-finding. The PCP documented the diagnosis of ODS, ordered physical and occupational therapy, and expedited the neurology referral.

30. On 28 April 2024, MR. PERKINS messaged his PCP reporting double vision. On 29 April 2024, he was evaluated by neurologist Dr. William Chapman, who confirmed the diagnosis of ODS. On 2 May 2024, MR. PERKINS was seen by a urology group for urinary retention. Between April 2024 and April 2025, MR. PERKINS required multiple ambulatory visits to neurology, urology, physical therapy, occupational therapy, speech therapy and neuropsychology to address his neurocognitive and urological symptoms.

31. On 14 April 2924, MR. PERKINS underwent a repeat brain MRI, which showed findings consistent with sequelae of ODS.

**COUNT I**
**(*Vicarious liability of HCA LARGO for the Medical Negligence of Kedar Ravindra Shetye, M.D.*)**

32. Plaintiffs reallege paragraphs 1 through 31.

33. At all material times, nephrologist Kedar Ravindra Shetye, M.D. ("Dr. Shetye") was an actual and/or apparent agent, servants, or employees of HCA LARGO, acting within the scope of his agency or employment.

34. Hyponatremia is routinely managed by nephrologists in a hospital setting like that described above.

35. The standard of care requires cautious correction of serum sodium in patients like MR. PERKINS with chronic hyponatremia who have risk factors for neurologic injury. Rapid correction in such patients can cause ODS, a condition associated with severe and often irreversible neurologic injury and, in some cases, death.

36. Because of these well-known risks, the standard of care requires gradual correction of serum sodium. Evidence demonstrates that most cases of ODS occur when serum sodium increases by more than 8 mEq/L in any 24-hour period.

37. MR. PERKINS presented with chronic, severe hyponatremia (serum sodium <120 mEq/L) and moderate symptoms, including confusion. He also had risk factors for rapid correction (hypokalemia, thiazide diuretic use) and risk factors for ODS, particularly alcohol use disorder, hypokalemia and hypophosphatemia.

38. For patients with chronic, severe hyponatremia with moderate symptoms who are at risk for ODS, the standard of care is to raise the serum sodium by 4 to 6 mEq/L within the first several hours, which is generally sufficient to alleviate even the most severe symptoms of hyponatremia. Thereafter, the serum sodium should be maintained at that level for the remainder of the 24-hour period.

39. Under no circumstances should the serum sodium increase by more than 8 mEq/L in any 24-hour period.

40. In patients such as MR. PERKINS—who had significant risk factors for both rapid serum sodium correction and ODS—a reactive strategy using desmopressin should have been implemented once the target correction of 4–6 mEq/L was achieved and before exceeding the upper limit of 8 mEq/L.

41. Specifically, desmopressin should have been administered when MR. PERKINS's serum sodium reached 113 mEq/L at 5:08 a.m. on April 5, 2024, representing a 7 mEq/L increase from a prior level of 106 mEq/L approximately 24 hours earlier. This intervention would have prevented further increases and maintained the serum sodium within the recommended correction range through the 24-hour period. Administering desmopressin at that point was necessary to meet the standard of care; unfortunately, Dr. Shetye negligently and carelessly failed to do so.

42. Because Dr. Shetye negligently and carelessly failed to initiate desmopressin when the serum sodium reached the appropriate correction threshold, MR. PERKINS experienced overcorrection of his serum sodium levels.

43. Dr. Shetye made things worse when he recommended continuation of normal saline intravenous fluids and administration of 15 mg of tolvaptan—both interventions he knew or should have known would further increase serum sodium levels in MR. PERKINS.

44. Moreover, when the serum sodium overcorrected, Dr. Shetye negligently and carelessly failed to promptly recommend relowering the

serum sodium with dextrose 5% in water (D5W) and desmopressin.

45. D5W was not recommended until the serum sodium reached 126 mEq/L at 6:44 p.m. on 5 April 2024, by which point the level had increased by 19 mEq/L from a prior serum sodium of 107 mEq/L approximately 24 hours earlier. Not only did Dr. Shetye wait too long to initiate D5W, he knew or should have known that the use of D5W alone, without desmopressin, would likely be insufficient to effectively relower serum sodium levels in MR. PERKINS.

46. Dr. Shetye negligently failed to prevent overcorrection of severe hyponatremia in a patient at high risk for both rapid correction of serum sodium and ODS. Once overcorrection occurred, Dr. Shetye negligently and carelessly failed to promptly recognize it, and the treatment he recommended was inadequate to effectively relower the serum sodium.

47. The acts and omissions set out above constitute breaches of the prevailing professional standard of care, skill, and treatment which in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably careful and similarly trained nephrologists.

48. As a direct and proximate result of Dr. Shetye's negligence, MR. PERKINS suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of earning capacity and aggravation of a previously existing condition; the injuries are either permanent or continuing in nature and MR. PERKINS will suffer the losses and impairment in the future.

49. HCA LARGO is liable for the negligent acts and omissions of Dr. Shetye under the doctrine of respondeat superior.

WHEREFORE Plaintiffs demand judgment for damages against HCA LARGO together with taxable costs, and such other and further relief as this court may deem proper. **Plaintiffs demand trial by jury on all issues.**

**COUNT II**
***(Vicarious liability of HCA LARGO for the Medical Negligence of CONNELLY and SULLIVAN)***

50. Plaintiffs reallege paragraphs 1 through 31.

51. At all material times, CONNELLY and SULLIVAN were actual agents or employees of HCA LARGO, acting within the scope of their

agency or employment.

52. On the day of discharge, CONNELLY documented that he personally completed a face to face examination of MR. PERKINS and was present for the key portions of the SULLIVAN’S care. The chart was reviewed and the patient's discharge management was discussed with the resident.

53. The most recent sodium level before discharge was 132, and it had been recommended that MR. PERKINS be administered desmopressin, a drug that lowers sodium levels or prevents too precipitous an increase in serum sodium levels.

54. CONNELLY and SULLIVAN knew or should have known of the recommendation that MR. PERKINS receive desmopressin, that he hadnot received desmopressin, and the risks and consequences should he not receive desmopresin as ordered or recommended.

55. Discharging MR. PERKINS with an order or recommendation for desmopressin without administering desmopressin, without checking his current sodium levels, and without informing the patient of the consequences of such omissions (failure to perform an informed refusal of

treatment) constitutes a breach of the prevailing professional standard of care, skill, and treatment which in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably careful and similarly trained physicians.

56. As a direct and proximate result of the negligent acts and omissions of CONNELLY and SULLIVAN, MR. PERKINS suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of earning capacity and aggravation of a previously existing condition; the injuries are either permanent or continuing in nature and MR. PERKINS will suffer the losses and impairment in the future.

57. HCA LARGO is liable for the negligent acts and omissions of CONNELLY and SULLIVAN under the doctrine of respondeat superior.

WHEREFORE Plaintiffs demand judgment for damages against HCA LARGO together with taxable costs, and such other and further relief as this court may deem proper. **Plaintiffs demand trial by jury on all issues.**

**COUNT III**
**(*Vicarious liability of HCA LARGO for the Medical Negligence of KYPRIANOU*)**

58. Plaintiffs reallege paragraphs 1 through 31.

59. At all material times, KYPRIANOU was an actual and/or apparent agent, servants, or employee of HCA LARGO, acting within the scope of his agency or employment.

60. As indicated above, MR. PERKINS was at increased risk for overcorection of his serum sodium levels because he suffered from hypokalemia (low potassium) and use of a thiazide diuretic. MR. PERKINS was also at increased and risk for development of ODS *if overcorrection occured* because of his alcohol use, hypokalemia and hypophosphatemia.

61. For patients with chronic, severe hyponatremia with moderate symptoms who are at risk for ODS, the standard of care is to raise the serum sodium by 4 to 6 mEq/L within the first several hours, which is generally sufficient to alleviate even the most severe symptoms of hyponatremia. Thereafter, the serum sodium should be maintained at that level for the remainder of the 24-hour period.

62. Under no circumstances should the serum sodium increase by more than 8 mEq/L in any 24-hour period.

63. In patients such as MR. PERKINS—who had significant risk factors for both rapid serum sodium correction and ODS—a reactive strategy using desmopressin should have been implemented once the target correction of 4–6 mEq/L was achieved and before exceeding the upper limit of 8 mEq/L.

64. This intervention would have prevented further increases and maintained the serum sodium within the recommended correction range through the 24-hour period.

65. The plan developed by KYPRIANOU negligently called for an overly rapid rate of sodium correction for MR. PERKINS and negligently failed to call for administration of desmopressin to protect against overcorrection.

66. Moreover, KYPRIANOU negligently called for sodium levels to be checked every 4 hours when they should have been assessed more frequently.

67. The acts and omissions set out above constitute breaches of the prevailing professional standard of care, skill, and treatment which in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably careful and similarly trained physicians.

68. As a direct and proximate result of the above negligent acts and omissions, MR. PERKINS suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of earning capacity and aggravation of a previously existing condition; the injuries are either permanent or continuing in nature and MR. PERKINS will suffer the losses and impairment in the future.

69. HCA LARGO is liable for the negligent acts and omissions of KYPRIANOU under the doctrine of respondeat superior.

WHEREFORE Plaintiffs demand judgment for damages against HCA LARGO together with taxable costs, and such other and further relief as this court may deem proper. **Plaintiffs demand trial by jury on all issues.**

**COUNT IV**
**(*Vicarious liability of HCA LARGO for the Negligence of its nursing staff*)**

70. Plaintiffs reallege paragraphs 32 through 49, 51 through 57, and 59 through 69.

71. At all times material hereto, HCA LARGO held itself out to the public as being properly staffed and equipped and licensed to render appropriate medical care and treatment to the general public, including MR. PERKINS.

72. MR. PERKINS was a patient at HCA LARGO'S hospital from 3 April 2024 until 7 April 2024.

73. During that period of time, the nursing staff at HCA LARGO'S hospital negligently failed to advocate for appropriate treatment of hyponatremia, failed to seek to discontinue inappropriate treatment in a patient with overcorrection of serum sodium, and demonstrated a profound lack of nursing knowledge regarding hyponatremia, its sequelae, and its treatment.

74. Despite a plan calling for close monitoring of sodium levels and other electrolytes, MR. PERKINS sodium was allowed to rise thirty points

to 133, exceeding even the excessive parameters in place. Sodium levels were only to be checked every 4 hours and no protective desmopressin was called for in correcting the hyponatremia.

75. The acts and omissions set out above constitute breaches of the prevailing professional standard of care, skill, and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by similar health care providers. Moreover, the acts and omissions set out above occurred within the course and scope of the nursing staff's employment with HCA LARGO.

76. As a direct and proximate result of the above negligent acts and omissions, MR. PERKINS suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of earning capacity and aggravation of a previously existing condition; the injuries are either permanent or continuing in nature and MR. PERKINS will suffer the losses and impairment in the future.

77. HCA LARGO is liable for the negligent acts and omissions of its nursing staff under the doctrine of respondeat superior.

WHEREFORE Plaintiffs demand judgment for damages against HCA LARGO together with taxable costs, and such other and further relief as this court may deem proper. **Plaintiffs demand trial by jury on all issues.**

**COUNT V**
**(*Negligence against HCA LARGO pursuant to Florida Statutes §766.110* )**

78. This is an action for damages brought pursuant to §766.110 Fla. Stat.

79. Plaintiff realleges paragraphs 32 through 49, 51 through 57, and 59 through 69.

80. Pursuant to Florida Statutes §766.110(1), HCA LARGO had, at all times material to this lawsuit, a duty to assure comprehensive risk management and the competence of its medical staff and personnel through careful selection and review, and is liable for a failure to exercise due care in fulfilling these duties.

81. The statute further requires that all health care facilities

(a) adopt "written procedures for the selection of staff members and a periodic review of the medical care and

treatment rendered to patients by each member of the medical staff,"

(b) adopt "a comprehensive risk management program which fully complies with the substantive requirements of §395.0197," and

(c) initiate and administer these "medical review and risk management processes ... including the supervision of the medical staff and hospital personnel to the extent necessary to ensure that such medical review and risk management processes are being diligently carried out." §766.110(1)(a)–(c).

82. HCA LARGO negligently failed to comply with its mandatory obligations under §766.110 by virtue of one or more of the following acts or omissions:

a. Failing to have and comply with a comprehensive risk management program pursuant to §395.0197, Florida Statutes;

b. Failing to properly investigate and analyze the frequency and causes of general categories and specific types of adverse incidents to patients;

c. Failing to develop appropriate measures to minimize the risk of adverse incidents to patients;

d. Failing to analyze patient grievances that relate to patient care and the quality of medical services

e. Failing to develop and employ a system for timely informing a patient or an individual identified pursuant

to §765.401(1) that the patient was the subject of an adverse incident , as defined Florida Statutes §395.0197.

f. Failing to develop and implement an incident reporting system based upon the affirmative duty of all health care providers and all agents and employees of the licensed health care facility to report adverse incidents to the risk manager, or to his or her designee, within 3 business days after their occurrence.

g. Failing to use reasonable care in the selection and retention of Dr. Shetye as a member of the active medical staff with delineated clinical privileges to include performing consultations for patients presenting to the hospital emergency department or otherwise admitted to the hospital with hyponatremia;

h. Failing to assure comprehensive risk management and the competence of its medical staff and personnel through a careful selection or review, including failure to monitor adverse medical incidents in such a manner that risk management personnel could readily access historical documents by physician;

i. Failing to have appropriate policies and procedures in place to address the correction of hyponatremia without causing osmotic demyelination syndrome;

j. Falsely classifying adverse medical incident records as patient safety work product when such records are not patient safety work product;

83. As a direct and proximate result of HCA LARGO'S failure to exercise reasonable care in fulfilling one or more of its duties under

§766.110, MR. PERKINS suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of earning capacity and aggravation of a previously existing condition; the injuries are either permanent or continuing in nature and MR. PERKINS will suffer the losses and impairment in the future.

84. HCA LARGO is liable for the negligent acts and omissions of its nursing staff under the doctrine of respondeat superior.

WHEREFORE Plaintiffs demand judgment for damages against HCA LARGO together with taxable costs, and such other and further relief as this court may deem proper. **Plaintiffs demand trial by jury on all issues.**

**COUNT VI**
**(*Direct Negligence against HCA LARGO* )**

85. Plaintiffs reallege paragraphs 32 through 48, 51 through 56, 59 through 68, 71 through 76, and 78 through 83.

86. HCA LARGO failed to establish appropriate policies, procedures, and protocols for assessment and treatment of severe hyponatremia. For example, the correction rates suggested by the

hospital's electronic medical record exceed safe correction rates, and there is no care plan item allowing for use of desmopressin when carefully raising serum sodium levels.

87. Florida Administrative Code R. 59A-3.243 requires each hospital, including HCA LARGO'S, have a nursing department organized and staffed to provide quality nursing care to each patient.

88. HCA LARGO negligently and recklessly failed to staff its hospital with sufficient and properly trained nurses in order to provide quality nursing care to each patient as required by Florida law. The number of qualified nurses has regularly been insufficient to ensure immediate availability of a registered nurse for bedside care of any patient when needed, to assure prompt recognition of an untoward change in a patient's condition, and to facilitate appropriate intervention by nursing, medical or other hospital staff members. In the instant case, nursing deviations from the standard of care likely were likely contributed to by inadequate or untrained nursing staff.

89. The nursing department has failed to establish clearly defined standards for nursing care and mechanisms for evaluating such care.

The nursing department's written standards of nursing practice and related policies and procedures do not clearly define and describe the scope and conduct of patient care provided by the nursing staff.

The number of qualified nurses shall be sufficient to ensure immediate availability of a registered nurse for bedside care of any patient when needed, to assure prompt recognition of an untoward change in a patient's condition, and to facilitate appropriate intervention by nursing, medical or other hospital staff members.

90. The acts and omissions set out above constitute breaches of the prevailing professional standard of care, skill, and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by similar hospitals and health care providers.

91. As a direct and proximate result of the above negligent acts and omissions, MR. PERKINS suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of earning capacity and aggravation of a previously existing condition; the injuries are either permanent or

continuing in nature and MR. PERKINS will suffer the losses and impairment in the future.

WHEREFORE Plaintiffs demand judgment for damages against HCA LARGO together with taxable costs, and such other and further relief as this court may deem proper. **Plaintiffs demand trial by jury on all issues.**

**COUNT VII**
***(Negligence Against STROM)***

92. Plaintiffs reallege paragraphs Plaintiffs reallege paragraphs 32 through 48, 51 through 56, 59 through 68, 71 through 76, 78 through 83, and 86 through 91.

93. Pursuant to state and federal law, HCA LARGO is required to "have an effective governing body legally responsible for the conduct of the hospital as an institution." The governing body must appoint a chief executive officer who is responsible for managing the hospital.

94. STROM is, and at all material times was, HCA LARGO'S chief executive officer. At all relevant times, STROM was responsible for managing the hospital. Pursuant to 59A-3.273, Florida Administrative Code, STROM was responsible for the operation of the hospital in a manner commensurate with the authority conferred by the governing

body. STROM was obligated to take all reasonable steps to provide for compliance with applicable laws and regulations.

95. Additionally, STROM was charged with the duty to insure the establishment and implementation of organized management and administrative functions, including clear lines of responsibility and accountability within and between department heads and administrative staff; effective communication mechanisms among departments, medical staff, the administration and the governing body; Internal controls; a mechanism for receiving and responding to complaints concerning patient care; and an internal risk management program which meets the requirements of Section 395.0197, Fla. Stat.

96. Since joining HCA LARGO, STROM has failed to take all reasonable steps to provide for compliance with applicable laws and regulations. For example, STROM has failed to take any steps whatsoever to comply with HCA LARGO'S obligations under Art. X, §25 of the Florida Constitution. STROM has failed to insure that HCA LARGO has any meaningful risk management program, instead fostering an environment where adverse events are covered up, and any post incident review that is

carried out is done in a half-hearted manner. He has failed to reexamine the nature of HCA'S relationship with its patient safety organization and failed to prevent the patient safety organization from blocking patient access to records legally required to be disclosed upon request.

97. STROM has negligently failed to insure that clear policies were in place to deal with situations like that presented in the instant case: Nurses failing to intervene to stop injury to a patient as that patient's sodium levels rose too rapidly right before their eyes.

98. While the standard of care required that the nurses advocate on behalf of their patient, the prevailing culture under STROM'S leadership militated against such action.

99. STROM has negligently failed to insure that there are clear lines of responsibility and accountability within and between department heads and administrative staff at HCA LARGO. Had such clear lines existed in April 2024, communication between nursing supervisors and attending physicians would, more likely than not, have prevented this unfortunate case from arising.

100. As a direct and proximate result of the above negligent acts and omissions, MR. PERKINS suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of earning capacity and aggravation of a previously existing condition; the injuries are either permanent or continuing in nature and MR. PERKINS will suffer the losses and impairment in the future.

WHEREFORE Plaintiff demands judgment for damages against STROM, together with taxable costs, and such other and further relief as this court may deem proper. **Plaintiff demands trial by jury on all issues.**

**COUNT VIII**

**(*Action against against HCA Healthcare for chronic deliberate understaffing of HCA LARGO'S hospital*)**

101. Plaintiffs reallege paragraphs Plaintiffs reallege paragraphs 32 through 48, 51 through 56, 59 through 68, 71 through 76, 78 through 83, and 86 through 91, and 93 through 100.

102. HCA Healthcare is the largest for-profit hospital operator in the United States. According to its website, HCA Healthcare operates 189

hospitals and approximately 2,600 ambulatory sites of care in 19 states and the United Kingdom, generating billions of dollars in annual revenue.

103. HCA HEALTHCARE exercises pervasive and direct control over the operations of the HCA LARGO, including but not limited to: setting nurse-to-patient staffing ratios and budgets; determining staffing levels for nursing, physician extenders, and ancillary staff; establishing policies governing patient monitoring, laboratory result review, and electrolyte management protocols; and dictating cost-reduction and financial performance metrics that directly impact patient care.

104. HCA HEALTHCARE has implemented and maintained a system of chronic, deliberate understaffing at HCA LARGO'S hospital and across their Florida hospital network as part of a profit-maximization strategy. This systemic understaffing is well-documented, including in federal regulatory actions, whistleblower complaints, published investigative reporting, and prior litigation.

105. HCA LARGO'S nursing staff were carrying patient loads materially in excess of safe staffing ratios, including ratios that exceeded the levels recognized by nursing professionals as necessary for the safe

management of acutely ill patients requiring close electrolyte monitoring.

106. Twenty-nine days before MR. PERKINS presented to HCA LARGO'S hospital, about two dozen nurses protested outside HCA LARGO'S hospital to bring attention to a staffing model they said compromised patient care and safety and was causing burnout of registered nurses.

107. According to a story in the Tampa Bay Times, HCA HEALTHCARE dismissed the nurses concerns, dismissing them as "various antics" orchestrated by the nurses' union. It labeled the claims unfounded.

108. But the claims were not unfounded. HCA HEALTHCARE forced the use of the Team Nursing model, a staffing approach phased out more than 35 years ago in favor of primary nursing, where nurses care for fewer patients and can provide a more individualized level of care.

109. The approach used by HCA LARGO in treating MR. PERKINS, at the specific direction of HCA HEALTHCARE, represented substandard care. The Team nursing model sacrifices quality patient care for the primary goal of cost saving and increasing profit margins.

110. HCA HEALTHCARE was aware, or should have been aware, of widespread reports, internal complaints, nurse turnover, and prior adverse events demonstrating that the Hospital's staffing levels were dangerously insufficient to provide safe patient care — including adequate monitoring of patients with electrolyte disorders requiring close observation.

111. HCA HEALTHCARE prioritized financial metrics, executive compensation, and shareholder returns over adequate staffing and patient safety. HCA HEALTHCARE reported a full-year 2024 net income attributable to the company of $5.76 billion, up approximately 9.9% compared to $5.24 billion in 2023 while maintaining staffing budgets knowingly insufficient to provide safe care at HCA LARGO'S hospital.

112. The inadequate nursing staffing at HCA LARGO'S hospital directly contributed to the failure to: (a) perform more timely and adequate laboratory monitoring of the Patient's serum sodium levels; (b) more timely recognize the rate and extent of sodium overcorrection; (c) timely communicate critical laboratory values to treating physicians; (d) timely administer rescue therapy; and (e) implement and follow appropriate

hyponatremia management protocols.

113. The conditions described herein were substantially certain to cause patient harm and represent a conscious disregard for the safety of patients including MR. PERKINS.

114. As a direct and proximate result of the above negligent acts and omissions, MR. PERKINS suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of earning capacity and aggravation of a previously existing condition; the injuries are either permanent or continuing in nature and MR. PERKINS will suffer the losses and impairment in the future.

115. The conduct causing MR. PERKINS'S injuries was so gross and flagrant as to show a reckless disregard of human life or of the safety of persons exposed to the effects of such conduct; or the conduct showed such an entire lack of care that there must have been conscious indifference to the consequences; or the conduct showed such an entire lack of care that there must have been wanton or reckless disregard for the safety of the

public; or the conduct showed such reckless indifference to the rights of others as to be equivalent to an intentional violation of those rights.

WHEREFORE Plaintiff demands judgment for compensatory and punitive damages against HCA HEALTHCARE, together with taxable costs, and such other and further relief as this court may deem proper. **Plaintiff demands trial by jury on all issues.**

**COUNT IX**
**(*Loss of Consortium*)**

116. Plaintiffs reallege paragraphs 101 through 115.

117. By reason of the above described wrongful acts or omissions, MRS. PERKINS has been deprived of her husband's society, companionship, consortium, and services in and about their home and will continue to be deprived thereof in the future.

WHEREFORE Plaintiffs demand judgment for damages against defendants, together with taxable costs, and such other and further relief as this court may deem proper. **Plaintiffs demand trial by jury on all issues.**

**DATED** this 10th day of September, 2026.

**TRENTALANGE & KELLEY, P.A.**

Michael J. Trentalange

**MICHAEL J. TRENTALANGE, ESQ.**
Florida Bar No.: 850942
mjt@tktampa.com;
service@tktampa.com
**AMY K. TRENTALANGE, ESQ.**
Florida Bar No. 1049853
akt@tktampa.com
218 N. Dale Mabry Highway
Tampa, Florida 33609
(813) 226-1080 Fax: (813) 226-1081
**Attorneys for Plaintiff(s)**